



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  09-22423-CIV-UNGARO/McALILEY

R. TRAVIS COLLINS, as Personal Representative
of the Estate of DAVID KNOWLTON, deceased,

      Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC., a Maryland
corporation;   THE   RITZ-CARLTON   HOTEL
COMPANY, LLC, a Maryland corporation; THE
RITZ-CARLTON   MANAGEMENT   COMPANY,
LLC,   a   Maryland   corporation;   THE   RITZ-
CARLTON HOTEL, COMPANY, LTD., a foreign
corporation; THE ABACO CLUB RC, LTD., a
foreign corporation, and THE ABACO CLUB
ASSOCIATION, LTD., a foreign corporation,

      Defendants.

## NOTICE OF APPEAL

Notice is hereby given that R. TRAVIS COLLINS, as Personal Representative of the

Estate of DAVID KNOWLTON, deceased, the Plaintiff in the above-styled case, pursuant to the

Federal Rules of Appellate Procedure and 28 U.S.C. § 1291, hereby appeals to the United States

Court of Appeals for the Eleventh Circuit from the Judgment entered in this case on July 26,

2012, as docket entry number 418 (attached as Exhibit "A"), and from the Omnibus Order

denying Plaintiff's motion for new trial and renewed motion for judgment as a matter of law, and

granting Defendants' renewed motion for judgment as a matter of law, entered in this case on

October 11, 2012, as docket entry number 438 (attached as Exhibit "B").  These orders are final

in nature.

Respectfully submitted,

DOFFERMYRE SHIELDS CANFIELD
    & KNOWLES, LLC
1355 Peachtree Street, Suite 1600
Atlanta, GA  30309
Telephone:  404/881-8900
Facsimile:  404/881-3007
By:        Everette L. Doffermyre, Esq.
               Martha J. Fessenden, Esq.
E-mail:    edoffermyre@dsckd.com
               mfessenden@dsckd.com


    and

LAW OFFICES OF ROBERT L. PARKS, P.L.
2121 Ponce de Leon Boulevard, Suite 505
Coral Gables, FL  33134
Telephone: 305/445-4430
Facsimile:  305/445-4431
E-mail:    bob@rlplegal.com
*Counsel for Plaintiff*

BY: _____
ROBERT L. PARKS
Florida Bar No.:  061436

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on this **31st** day of **October, 2012**, a copy of the foregoing notice of appeal was served by U.S. Mail on all counsel of record or pro se parties identified on the attached Service List.


_____
ROBERT L. PARKS
Florida Bar No.:  061436

## SERVICE LIST

Everette L. Doffermyre, Esq.
edoffermyre@dsckd.com
Martha J. Fessenden, Esq.
mfessenden@dsckd.com
Doffermyre Shields Canfield & Knowles, LLC
1355 Peachtree Street, Suite 1600
Atlanta, GA  30309
Telephone:     404/881-8900
Facsimile:     404/881-3007
*Co-Counsel for Plaintiff*

Todd R. Ehrenreich, Esq.
tehrenreich@wwhgd.com
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
2601 South Bayshore Drive
Suite 1500
Miami, FL  33133
Tel:     305/455-9500
Fax:     305/455-9501
*Counsel for Defendants*

Cristina Alonso, Esq.
calonso@carltonfields.com
Olga M. Vieira, Esq.
ovieira@carltonfields.com
Carlton Fields, P.A.
4200 Miami Tower
100 Southeast Second Street
Miami, FL  33131
Tel:     305/ 530-0050
Fax:     305/ 530-0055
*Co-Counsel for Defendants*

CASE NO. 09-22423-CIV-UNGARO/McALILEY

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 09-22423-CIV-UNGARO

R. TRAVIS COLLINS, as Personal
representative of the Estate of DAVID
KNOWLTON, deceased,

       Plaintiff,

v.

THE RITZ-CARLTON HOTEL COMPANY,
LLC, *et al.*,

       Defendants.

_____/

## JUDGMENT

This action was tried by a jury with Judge Ursula Ungaro presiding, and the jury

has rendered a verdict.  The jury found that there was negligence on the part of the

Defendants and David Knowlton that was the legal cause of David Knowlton's death,

apportioning 1% of fault to the Defendants and 99% of fault to David Knowlton.  The

jury found that the damages of the Estate of David Knowlton and his survivors totaled

zero.  (D.E. 406).  Accordingly, it is

       ORDERED that:

       the Plaintiff R. Travis Collins, as Personal Representative of the Estate of David

Knowlton, recover nothing, the action be dismissed on the merits, and the Defendants,

The Ritz-Carlton Hotel Company, LLC, the Ritz-Carlton Hotel Company, Ltd., The

Abaco Club RC, Ltd., and The Abaco Club Association, Ltd., recover costs from the

Plaintiff.

      DONE AND ORDERED in Chambers at Miami, Florida, this 25th day of July,

2012.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of record

CASE NO. 09-22423-CIV-UNGARO/McALILEY

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 1:09-cv-22423-UU

---

R. TRAVIS COLLINS, as
Personal Representative of the
Estate of DAVID KNOWLTON,
deceased

      Plaintiff,

vs.

MARRIOTT INTERNATIONAL,
INC., *et al.*,

      Defendants.

---

## <u>OMNIBUS ORDER</u>

THIS CAUSE is before the Court upon Plaintiff's Motion for New Trial and Renewed Motion for Judgment as a Matter of Law, D.E. 425, and Defendants The Ritz-Carlton Hotel Company, LLC, The Ritz-Carlton Hotel Company, Ltd., The Abaco Club RC, Ltd., and The Abaco Club Association, Ltd.'s Renewed Motion for Judgment as a Matter of Law, D.E. 428. Plaintiff and Defendants filed their respective responses and replies to these motions.

THE COURT has considered the Motions and the pertinent portions of the record and is otherwise fully advised in the premises.

As set forth below, the Court will grant Defendants' Motion for Judgment as a Matter of Law and deny Plaintiff's Motion for a New Trial.

## I. Background

This lawsuit arises out of David Knowlton's ("Knowlton") death during a weekend trip to the Abaco Club on the island of Abaco in the Bahamas. The Plaintiff, R. Travis Collins, is the personal representative of Knowlton's estate, the beneficiaries of which are Knowlton's two minor children. Defendants are entities that own or operate the Abaco Club facilities.

In the Complaint, Plaintiff alleged that Knowlton fell into the ocean and to his death from an area adjacent to the Abaco Club known as "the Point." Plaintiff claimed Knowlton's death was the result of Defendants' negligence. D.E. 8. Although the land that constitutes the Point is owned by a non-party, Scott Libertore, and not by Defendants, Plaintiff alleged that Knowlton was Defendants' invitee on the Point and that Defendants were negligent either: (1) in failing to adequately maintain the Point; (2) in failing to provide adequate warnings regarding the dangerous conditions at the Point; or (3) in failing to prohibit residents and guests at the Abaco Club from accessing that area.[1] *Id.*

Pretrial, Plaintiff and Defendants filed cross motions for summary judgment. Importantly, Defendants moved for summary judgment on the ground that Plaintiff could not prove that Defendants' alleged negligence proximately caused Knowlton to fall from the Point. D.E. 171. Plaintiff moved for summary judgment on

---

[1]     The Complaint was filed on August 17, 2009, D.E. 1, and the case was originally assigned to the Honorable Adalberto Jordan. On March 15, 2012, the case was reassigned to the undersigned. D.E. 338.

2

Defendants' affirmative defense that Knowlton's death was not an accident, but rather a suicide. D.E. 209. The Court denied both motions and the case proceeded to trial, beginning July 16, 2012. D.E. 419.[2]

Although Plaintiff did not present any direct evidence of how Knowlton died, Plaintiff relied on circumstantial evidence to prove that Knowlton met his death on the Point either by slipping and falling into the ocean, or upon being washed into the ocean by a "rogue wave." D.E. 424, at 850:7, 848:18-25, 849:1-3.[3] Plaintiff's counsel further relied on circumstantial evidence to establish that Defendants' negligence, either in their failure to warn Knowlton of dangers on the Point or in their failure to take reasonable measures to prevent access to the Point was the legal cause of Knowlton's death. D.E. 424, at 841:15-20, 596-597, 760, 776.[4]

---

[2]      The suicide defense was later withdrawn. However, Defendant consistently maintained that a proximate cause of Knowlton's death was his impairment from drugs and/or alcohol. D.E. 420, at 411:15-22; 294:1-18; 315:5-21; 323:24–324:1; D.E. 421, at 536:19-25; D.E. 422, at 680:2-18; D.E. 424, at 878:19-879:18.

[3]      The only witness to refer to "rogue waves" was Sorane Kennedy, one of the Abaco Club security officers who went to the Point the night of Knowlton's disappearance. Kennedy never explained what he meant by "rogue waves," – he only said his wife warned him to be careful of rogue waves out on the Point that night. D.E. 358-13, at 22:21-25, 23:1-7; 24:11-25, 25:1-19. He also stated that what he actually observed were only occasional waves spraying over the rocks and "[t]hat's just a normal part of being I the tropics, I guess." D.E. 358-13, at 25:10-19.

[4]      The Court had the following colloquy with counsel during the Rule 50 arguments at the end of all of the evidence:

> COURT: But Mr. Parks does not maintain that the Ritz should have done anything on the Point to fix the property...Mr. Parks contends that the Ritz should have put a fence or warning sign on the Ritz's own property saying [don't] go out to the Point. Right, Mr. Parks?

During their case-in-chief, Defendants presented evidence that the conditions on the Point, including the jagged terrain and a blowhole, were open and obvious conditions that should have been easily appreciated by Knowlton. Defendants also sought to prove that Knowlton was impaired due to his consumption of prescription drugs and alcohol, and that, if he died from a fall from the Point, his death was the proximate cause of his own negligence. D.E. 424, at 869:2-20; 872:13-23; 878:19-25; 879:10-18.

Beginning July 20, 2012, the Court held a charge conference and finalized the jury instructions and verdict form. At the charge conference, the parties agreed to the verdict form. The following day, Plaintiff objected to the jury instructions as follows: (1) that the Court failed to instruct the jury as a matter of law that Knowlton was an invitee on the Point; (2) to language in the jury instructions "concerning Mr. Knowlton being an invitee of the owners of the Point"; and (3) to the instruction on comparative negligence to the extent it referred to Defendants' related factual contentions. Despite his agreement, Plaintiff's counsel also objected to the verdict form because it did not ask the jury whether Knowlton was an invitee or a licensee on the Point – only whether Knowlton was an invitee. D.E. 424, at 835-86.

On July 23, 2012, after the parties delivered their closing arguments, the

---

PARKS: Correct.

D.E. 423, at 776:8-18.

4

Court instructed the jury.  D.E. 424, at 893.  Notably, the jury was instructed that if

it found that the parties were comparatively negligent, it should not reduce any

damages by the percentage of fault attributed to Knowlton.  D.E. 424, at 903:14-22.

After deliberating for two days, the jury returned a verdict, which in relevant

part was:

> 3. What proportion or percentage of fault do you
> find from a preponderance of the evidence to have been
> legally caused by the negligence of David Knowlton?
> Answer in terms of percentages
>
> The Defendants    1 %
> David Knowlton    99 %
>
> [Note: The total percentage given in your answer
> should equal 100%.]
>
> 4. If you answered "Yes" to Question 1, what sum of
> money do you find from a preponderance of the evidence
> to be the total amount of damages that the Estate of
> David Knowlton sustained as a result of David
> Knowlton's death (without adjustment by application of
> any percentages you may have given in answer to
> Question 3)?
>
> (a) Total amount of net accumulations
>     lost by the Estate in present value $ 0
>
> (b) Total amount of funeral expenses which
>     were paid on behalf of David Knowlton    $ 0

*See* D.E. 406.  Because it appeared that the jury may have failed to follow the

court's instructions by finding Defendants 1% at fault and awarding $0 in damages,

the Court twice invited counsel to come sidebar to address any issues that either

side perceived to render the verdict defective.  D.E. 424, at 924:1-3.  Plaintiff's

counsel expressly declined. Accordingly, the Court entered judgment for Defendant on July 25, 2012. D.E. 418.

## II. Defendant's Renewed Motion for Judgment as a Matter of Law

### A. Rule 50(b) Standard

Defendants' Motion for Judgment as a Matter of Law is governed by Rule 50(b). Rule 50(a) allows a party, prior to the submission of the case to the jury, to move for judgment in its favor on the basis "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." Fed. R. Civ. P. 50(a). If the Court does not grant the motion under Rule 50(a), a party may renew the motion under Rule 50(b) after the jury has returned a verdict.

Regardless of timing, a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence. *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). The question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is "legally sufficient to find for the party on that issue," regardless of whether the district court's analysis is undertaken before or after submitting the case to the jury. *Id.* Generally, "any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004).

6

In considering a motion for judgment as a matter of law, the court should review all the evidence of record, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), while drawing all reasonable inferences in favor of the plaintiff, and it may *not* make credibility determinations or weigh the evidence, *id*. However, "the court should give credence to evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from a disinterested witness." *Id.* (internal quotation marks omitted).

## B.  The Relevant Evidence

The testimony and evidence discussed below is material to the Rule 50(b) analysis, and the Court views it in the light most favorable to the Plaintiff:

The Abaco Club is located on a remote peninsula surrounded by beaches on one side and bluffs on the other. Pl.'s Ex. 6,17; Def.'s Ex. 1.  It consists of multimillion dollar "cottages" and various amenities, including a golf course. Pl.'s Ex. 17, 19; Def.'s Ex. 1.  These amenities are accessible to hotel guests and Abaco Club members, such as Knowlton. The Abaco Club property does not include the Point.  Rather, the Point is a rocky promontory adjacent to the Abaco Club that abuts the ocean at the island's extreme southeastern tip. D.E. 419, at 206:15-25. The Point is owned by Scott Libertore, D.E. 401-1, at 17:20-22,  but is only accessible through the Abaco Club property.  D.E. 419, at 188:20-25.

Because the Point is characterized by uneven topography, cliffs that drop off to the ocean, D.E. 420, at 284:18-22, a blowhole, and honeycombed volcanic rock

7

formations that the locals describe as "sharp sticky rocks," D.E. 422, at 648:10-14, it

poses obvious dangers.  For example, the terrain is so rocky that it cannot be

traversed by golf cart or even easily by foot. D.E. 419, at 206:15-25; D.E. 420, at

311:6-23; D.E. 358-15, at 17:8-17; D.E. 422, at 663:23-24.  Nevertheless, there is a

rough path that intersects the golf cart path in the area of the Point. D.E. 420, at

260:8-23.  That path leads to a crest overlooking the Point, and then loops back

along the resort's eastern coastline. Def.'s Ex. 1; D.E. 401-1, at 35:7-14.  The crest

is about 50 feet from where the golf cart path and the rough path intersect, D.E.

419, at 206:15-25; D.E. 420, at 268:21-25, 269:1-25, 270:1, and about 200 feet from

the southernmost tip of the Point.  D.E. 358-8, at 80:2-5.   The crest affords a clear

view of the Point below and the surrounding area.  D.E. 420, at 270:10-23; Def.'s Ex.

1.; D.E. 358-8, at 78:25, 79:1-3.

Although the Point is owned by Scott Libertore, Abaco Club employees knew

that guests and owners frequented the Point. D.E. 358-8, at 28:22-24, 35:5-11; D.E.

358-2 at 15:23-25, 16:2-11.  And although Plaintiff presented no evidence of prior

accidents on the Point,[5] Abaco Club employees would, from time to time, warn the

guests and owners not to venture onto the property. The Point was not fenced off

and there were no posted warnings in the area until after the accident.  D.E. 358-

---

[5]     George Forbes, Manager of the Loss Prevention and Security Department,
testified that in the 13 months prior to accident when he worked at Abaco Club, he
had not heard of any complaints or incidents on the Point, D.E. 422, at 634:14-18.
Similarly, Saronne Kennedy, a subordinate of Forbes, testified that there were no
incidents on the Point in the four and one-half years he worked at the Abaco Club.
D.E. 358-13, at 52:2-9.

21, at 77:16-25, 78:1-5; D.E. 419, at 186:22-25, 187:1-3; D.E. 420, at 271:18-25, 272:1.

In 2005, Knowlton, together with his first wife and business partner, Bonnie Shuman, purchased a cottage overlooking the eighteenth green, with sweeping ocean views. D.E. 419, at 183:3-9, 184:14-16. By August 19, 2007, the date of the incident here at issue, Knowlton had visited the Abaco Club several times. D.E. 358-21, at 18:7-9; D.E. 358-23, at 6:3-4, 14-16. He had also been on the Point on past occasions. D.E. 358-15, at 26:20-25; D.E. 358-21, at 36:19-24.

Knowlton and three friends, Kim Hoffer, Ed Stamper, and Mike Lester, arrived at the Abaco Club on August 16, 2007 for a long weekend of golfing, fishing, and card-playing. Knowlton, Lester, and Hoffer intended to depart on August 20, 2007, *see* D.E. 358-21, at 15:23-25, 16:1-7, while Stamper intended to stay on for a few more days. On August 19, 2007, as their weekend was coming to a close, the weather conditions changed – the winds picked up, the sea turned rough, and ocean spray could be seen above the twenty-foot cliffs on the easterly side of the peninsula. D.E. 423, at 745:5-12. The men decided to take advantage of the dramatic backdrop and take photographs. D.E. 420, at 281:6-15, 283:8-12. They began by taking photographs in the area of Knowlton's cottage near the eighteenth hole of the Abaco Club golf course. D.E. 420, at 284:10-17; Pl.'s Ex. 42. Then, as the sun was setting, they decided to go by golf cart to the Point, and there take more pictures. According to Hoffer, they had intended to take photographs on the crest, but there was a beautiful sunset visible from the golf cart path and Knowlton's

friends decided first to take pictures there.  Knowlton, however, parted company with his friends and was last seen walking on the path toward the crest.  D.E. 420, at 289:4-11.  About two to ten minutes later, Knowlton's friends walked to the crest to catch up with Knowlton, but Knowlton was nowhere to be seen.  D.E. 420, at 291:18-19, 328:7-13.

That evening, Knowlton's friends, together with Abaco Club employees, undertook a search for Knowlton, but to no avail.  The only item recovered from the Point that evening was a yellow flip-flop.  D.E. 422, at 640:24-25, 641:1.  The following day, Knowlton's partially submerged, decomposed, and mutilated corpse was located some 2.5 miles from the Abaco Club in a cove in an area on Abaco Island known as Yellow Wood.  D.E. 422, at 645:1-5.

The Bahamian authorities took custody of the body and, on August 22, 2007, an autopsy was performed.  The pathologist conducting the autopsy was not able to collect any blood from the cadaver, but he did obtain a urine sample.  D.E. 421, at 518:8-15.  The urine sample was not submitted for toxicology screening until mid-2008.  At that time, Dr. Hearn, the toxicologist, found trace amounts of sedatives and a urine-alcohol concentration of .22 percent.  The death certificate lists the cause of death as "polytrauma with intracranial hemorrhage and fracture of ribs/injury upper and lower extremities; history of hypertension and depression."  Pl.'s Ex. 48.

10

Plaintiff also presented evidence that immediately after the incident, Defendants erected a partial plywood fence[6] – on Abaco Club property – intended to prevent its guests and residents from accessing the Point, and also one or two red and white "Do Not Enter" signs in front of a path leading up to the Point. D.E. 358-13, at 47:1-9; D.E. 419, at 210:21-25, 211:1-6; 358-8, at 60:10-25; D.E. 422, at 659:22-25, 660:1-9.  No one testified, however, that this type of fence or sign would have deterred Knowlton and others from entering onto the Point and Plaintiff did not present any evidence of how Defendants could have otherwise prevented Knowlton's death.

### C. Analysis

The issue at the heart of Defendants' Motion is whether Plaintiff put forth at trial sufficient evidence to allow a jury to find that Defendants' breach of duty was a proximate cause of Knowlton's death.  At Florida common law, there are four elements to the tort of negligence: duty, breach, causation, and damages.  *See Clay Elec. Coop. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).  Florida adheres to the "more likely than not" standard of proof for proximate causation in negligence actions.  *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  The Florida Supreme Court has subscribed to the formulation described by Professor Prosser:

---

[6]    The plywood fence was replaced due to storm damage, apparently with different materials. D.E. 358-8, at 60:16-24.  At trial, the jury was shown photographs of a partial latticework fence. Pl.'s Ex. 12.

> [The plaintiff] must introduce evidence which affords a reasonable basis
> for the conclusion that it is more likely than not that the conduct of the
> defendant was a substantial factor in bringing about the result. A mere
> possibility of such causation is not enough; and when the matter remains
> one of pure speculation or conjecture, or the probabilities are at best
> evenly balanced, it becomes the duty of the court to direct a verdict for
> the defendant.

*Id.* at 1018 (citing William Prosser, *Law of Torts* § 41 (4th ed. 1971)). As the above

formulation suggests, the defendant's duty and breach thereof must be established

before its "conduct" can be determined to be a substantial factor or not. For the

purposes of this proximate cause analysis only, and consistent with Rule 50(a), the

Court will assume that the duty owed by Defendants to Knowlton were those owed

by an invitor to an invitee. As explained below, even under this assumption,

Plaintiff failed to put forth sufficient evidence to allow the jury to conclude that

Defendants' negligence was more likely than not a substantial factor in causing

Knowlton's death.

Assuming, for the sake of this analysis, that Defendants owed Knowlton the

duties owed to an invitee while he was on the Point, these duties would have been:

(1) to warn Knowlton of *concealed* dangers which were or should have been known

to Defendants and which were *unknown to Knowlton* and could not be discovered

through the exercise of due care; and (2) to use ordinary care to maintain the

premises in a reasonably safe condition. *See Rocamonde v. Marshalls of Ma, Inc.*,

56 So. 3d 863, 865 (Fla. Dist. Ct. App. 2011). Since the Point was not situated on

Defendants' premises, this second duty is inapplicable here.[7]  As for the first duty, a necessary corollary (and an especially apt one in this case), is that an owner has no duty to warn where the danger is obvious and apparent, or the invitee otherwise has knowledge of the danger which is equal to or superior to the owner's knowledge. *See Miller v. Wallace*, 591 So. 2d 971, 973 (Fla. Dist. Ct. App. 1991).

Under this theory, the Plaintiff had the task of proving that: (1) Defendants failed to warn Knowlton of a danger about which they had knowledge superior to Knowlton's own, and (2) that the failure to warn or otherwise stop Knowlton was the proximate cause of his death.  Plaintiffs did not offer any evidence of Defendants' superior knowledge of some concealed danger on the Point.  No evidence was offered, for example, that the rock ledge on the Point had become unstable, let alone that Defendants had superior knowledge of that.  Nor was evidence offered that there was a strong incoming storm, an overgrowth of slippery lichen on the Point, or really any evidence of a dangerous condition about which Defendants might have had superior knowledge.  And while one of Defendants' employees did state, during deposition, that his wife warned him about rogue waves that night, his own observation was that the wave activity that night was not out of the ordinary.[8]  Having failed to present any such evidence at trial, Plaintiff could

---

[7]     Plaintiff did not contend that Defendant Ritz should have done anything to modify the Point on Mr. Libertore's property, but rather that Defendant should have put a fence or warning side on its own property. *See supra* note 4.

[8]     *See supra* note 3.  In Plaintiff's closing argument, counsel referenced testimony by Mr. Kennedy, one of Defendants' employees, that his wife warned him of "rogue waves" before Mr. Kennedy went out with the search party.  D.E. 424, at

not possibly have shown that Defendants' conduct was more likely than not a substantial factor in Knowlton's death.

Even if Plaintiff had presented some evidence of Defendants' negligent conduct, its lack of evidence on the question of causation in and of itself implicates Florida's common law rule against an impermissible "stacking of inferences" at trial. That rule states that an ultimate fact may not be established on the basis of an inference unless the prior or basic inference is established to the exclusion of any other reasonable theory. *See Voelker v. Combined Ins. Co. of Am.*, 73 So. 2d 403, 407 (Fla. 1954); *Hurst v. Astudillo*, 631 So. 2d 380, 381 (Fla. Dist. Ct. App. 1994) ("Inferences may be pyramided only if the initial inference is established to the exclusion of any other reasonable theory."). Here, the initial inference would be that Knowlton was at the Point when he met with a danger about which Defendants had superior knowledge. If that initial inference were inescapable, the jury would be allowed to infer from further circumstantial evidence that this danger caused Knowlton to fall off the Point, causing his death.

Plaintiff's initial inference about what happened to Knowlton is based on circumstantial evidence that he disappeared shortly after he was seen heading toward the Point. This eyewitness testimony is not sufficient to establish, to the exclusion of all other theories, that Knowlton arrived at the Point and there

---

847:25-25, 848:1-3. Despite the implication that Defendants' search party was cognizant of this threat during the conduct of their search, no one testified to having witnessed unusual wave activity that or any other night.

encountered a danger about which Defendants could have and should have warned him. There are a number of plausible alternate theories that a reasonable person could infer from that testimony: that Knowlton descended at some point to take photos closer to the water and was crushed by the waves; that Knowlton did make it to the Point and jumped or dove off; that Knowlton made it to the Point and was pushed off by another person, or that Knowlton was swept off the Point by strong winds or an upsurge of waves. Plaintiffs' only additional evidence that Knowlton may have fallen from the Point was that Knowlton suffered cranial polytrauma—but how, and at what point he suffered these blows to the head were not remotely shown.

Florida courts have applied the rule against stacked inferences in ways much more demanding than this Court's application. For example, the rule was successfully invoked to overturn a jury verdict in favor a passenger who slipped on a ship ladder several days into a ten-day cruise. *See   McCormick Shipping Corp. v. Warner*, 129 So. 2d 448 (Fla. Dist. Ct. App. 1961). That court found that there was "no question that the movement of the ladder was the immediate cause of the appellee's fall, but there [was] nothing in [the] record to show why it moved." *Id.* at 449. The court found it permissible to infer that the ladder was defective, but impermissible to further infer that the defect was the proximate cause of the passenger's fall. *Id.* In *McCormick Shipping* the jury at least knew for a fact that the passenger had fallen from the ladder. As already discussed, Knowlton might have fallen from any place, or not have fallen at all. In a more recent case, *Stanley*

*v. Marceaux*, 991 So. 2d 938, 939 (Fla. Dist. Ct. App. 2008), the issue was whether Plaintiff could offer circumstantial evidence to establish that a roof was negligently repaired, then ask the jury to infer that this repair was the cause of its having crashed down into plaintiff's apartment. The court found this to be an impermissible stacking of inferences. *Id.*

Plaintiff cites a number of cases in support of its position that the only inference required in this case was that Knowlton met his death at the Point. In the cases that Plaintiff cites, however, there was evidence offered to prove that the Defendant had, or should have had, superior knowledge about a danger that was not obvious to the injured party. For example, in *Walt Disney World Co. v. Goode*, 501 So. 2d 622 (Fla. Dist. Ct. App. 1986), there was evidence that Defendant's employees knew that the 24-inch fence was not designed to keep children out of a moat into which decedent in that case fell. In *Goode*, Defendants knew or should have known of a non-obvious danger or defect and failed to address it. *See also Ortiz v. Lorie*, 921 So. 2d 868 (Fla. Dist. Ct. App. 2006) (evidence that defendant should have known of improper assembly and wear in ladder); *Nunez v. G.F. Car Center, Inc.*, 877 So. 2d 31 (Fla. Dist. Ct. App. 2004) (evidence that defendant should have known of grease accumulation on sidewalk); *Majeske v. Palm Beach Kennel Club*, 117 So. 2d 531 (Fla. Dist. Ct. App. 1959) (evidence that defendant should have known of defect in stairs). Another case cited is *Hialeah v. Revels*, 123 So. 2d 400, 402 (Fla. Dist. Ct. App. 1960), where there was evidence demonstrating

16

that one would have to approach the banks of a canal before becoming aware of its presence, and that drivers could have mistakenly thought that the street continued over the water (where decedent's vehicle was found). Photographs, engineer sketches, and witness testimony were all offered to show that the City of Hialeah was negligent in not erecting signs or barricades to alert drivers to the canal and prevent them from driving into it. *Id.*

Plaintiff did not identify anything misleading or concealed about the Point at the presumed time of Knowlton's fatality. Finally, even if an invitor owed its invitees a duty to erect signs, barricades, fences, or trenches in order to prevent them from approaching a prominent, natural feature on another's land, Plaintiff here – unlike the plaintiffs in the cases discussed above – offered no evidence as to how any of these remedial measures might have prevented Knowlton's death. Because Plaintiff did not offer any evidence of a danger at the Point, about which Defendants had superior knowledge and failed to warn Knowlton, *and* because its nebulous theory of causation would require an impermissible stacking of inferences under Florida law, this Court has no choice but to grant Defendants' Motion for Judgment as a Matter of Law on the issue of proximate cause.

### III. Plaintiff's Motion for a New Trial

#### A. Rule 59(a) Standard

Because the Court grants Defendants' renewed motion for judgment as a matter of law, it must also conditionally rule on Plaintiff's motion for a new trial. Fed. R. Civ. P. 50(c)(1). Pursuant to Rule 59(a), a judge may grant a new trial "for

any reason for which a new trial has heretofore been granted in an action at law in

federal court." Fed. R. Civ. P. 59(a).  The decision whether to grant a new trial is

within the court's discretion.  *Simon v. Shearson Lehman Bros., Inc.*, 895 F.2d 1304,

1310 (11th Cir. 1990). A new trial may be granted if the verdict stands against the

weight of the evidence, if a jury's damages award is excessive, or because of

substantial errors in the admission or rejection of evidence or the instructions to the

jury. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940).  Jury

instructions must fairly and adequately address the issues and correctly state the

law, and a motion for new trial may be granted in the trial court's sound discretion

on the ground that erroneous and prejudicial jury instructions were given.

*Christopher v. Cutter Labs.,* 53 F.3d 1184, 1190–91 (11th Cir. 1995).

Plaintiff asserts three grounds[9] supporting its motion for a new trial: (1) the jury returned

an impermissible compromise verdict; (2) the Court's erroneously allowed the admission of

---

[9]    Defendant addressed, as an alternative to Plaintiff's compromise verdict
argument, whether the jury's verdict was inconsistent pursuant to Federal Rule of
Civil Procedure 49(b)(3), (4).  Those subsections of the Rule do not apply to this
verdict, and so the Court finds that the jury did not render an inconsistent verdict.
The Court did, however, give Plaintiff  ample opportunity to object to the verdict
before the jury was discharged.  After the verdict was read, the Court asked, "Now,
do the lawyers want to come sidebar and have any discussion about this?"
Plaintiff's counsel responded, "I don't think so Your Honor." D.E. 424:924.  The
Court then polled the jury, with every juror affirming that he or she agreed with the
verdict.  The Court again gave counsel the opportunity to raise an objection to the
verdict, stating, "I'm about to [accept] the verdict.  So, again, is there anything we
need to talk about? Mr. Parks, nothing?"  D.E. 424:925.  To this direct inquiry,
Plaintiff's counsel responded, "No, Your Honor."  *Id.*  On this record, Plaintiff
waived any argument that verdict is inconsistent.  *See Coralluzo v. Ed. Mgmt.
Corp.,* 86 F.3d 185, 186 (11th Cir. 1996) (holding that Plaintiff waived its objection
to jury's failure to award damages by not objecting before jury was discharged).

toxicology evidence regarding Knowlton's urine-alcohol concentration; and (3) the Court gave

the jury an erroneous instruction as to Knowlton's invitee status.  For the reasons set forth below,

Plaintiff's motion for a new trial is conditionally denied.

### B. Analysis

### 1. Jury's "Compromise" Verdict

Plaintiff's first argument is that the jury's verdict is a "compromise verdict" that

inextricably intertwined liability and damages, thereby requiring a new trial.  D.E. 425.  The

Court rejects this argument.  Federal law governs the question of whether or not to grant a new

trial, even where the underlying issue is governed by state law.  *See Hattaway v. McMillian*, 903

F.2d 1440, 1450-51 (11th Cir. 1990).  Here, the underlying issue is whether the jury returned an

impermissible compromise verdict.  The Eleventh Circuit has provided the following Florida law

definition of a compromise verdict:

> A compromise verdict results when jurors resolve their inability to make a
> determination with any certainty or unanimity on the issue of liability by finding
> *inadequate damages*.  However, an insufficient damages verdict, standing alone, does
> not necessarily indicate a compromise.  Ordinarily there must be *other evidence*
> demonstrating that the deficient monetary award resulted from an impermissible
> compromise.

*Mekdeci ex rel. Mekdeci v. Merrell Nat. Labs.*, 711 F.2d 1510, 1513-14 (11th Cir. 1983)

(emphasis added) (internal citations and quotation marks omitted).  To determine whether this

verdict constitutes a compromise, the Court must first determine whether (1) the damages

awarded were *inadequate* as a matter of law; and (2) whether there is *other evidence*

demonstrating that there was a jury compromise at work.  Other courts have been reluctant to

give clear definitions to these two elements, but the case law does illustrate the bounds of these

19

concepts.  The instant verdict falls outside those bounds of both elements.

Courts that have found inadequate damages in the context of a compromise verdict have done so when the jury has found a defendant liable, but awards plaintiff less than the minimum amount stipulated by the parties before trial.  *See, e.g., Lucas v. Am. Mfg. Co.*, 630 F.2d 291, 292-94 (5th Cir. 1980); *Hatfield v. Seaboard Air Line R.R.*, 396 F.2d 721, 722 (5th Cir. 1968).[10] So long as the award does not contravene a stipulation or weigh totally against an indisputable sum certain, the jury is given substantial discretion within a range allowed by the evidence.  *See United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993).  The parties to this action did not stipulate to a minimum amount of damages incurred by Knowlton's estate.  Nor can it be said, especially in light of the non-economic damages alleged here, that the evidence presented at trial indisputably set a range for monetary recovery for which the minimum was greater than $0. Therefore, the Court declines to find that the jury's award of $0 was inadequate as a matter of law.

Even if the jury's award were legally inadequate, Plaintiff falls far short of meeting the standard for what constitutes other evidence of impermissible jury compromise.  For example, the verdict reviewed in *Lucas* was precipitated by inappropriate conduct on the part of the trial judge and strange behavior on the part of the jury.  First, the presiding judge admonished the jury to hurry their deliberation and reach a verdict before the arrival of a hurricane.  *Lucas*, 630 F.2d at 1514.  Second, the jury had been deliberating for several days, *id.*, and had sent several notes indicating uncertainty as to the specific issue of causation.  The jury even asked permission to

---

[10]     Decisions of the Fifth Circuit handed down on or before September 30, 1981 are controlling precedent in the Eleventh Circuit.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

render a verdict with corresponding reasons for the answers on their verdict form, going so far as to give the court its *reasons for wanting to give reasons*. *Id.* at 1514-15. One of these reasons was that the verdict would serve as "an admonition to one or both parties . . . [who] represent not only themselves, but a society in which [sic] they are an integral part." *Id.* at 1515 n.5. Finally, in one of their notes they explicitly stated that they were compromising. *Id.* at 1515.

The jury in the present action deliberated for fewer than two full days, and sent just one note seeking clarification from the Court. That note asked whether they could find the Defendants negligent with an award to the Plaintiff estate of zero dollars. D.E. 424, at 920:24-25, 921:1, 12-13. After consulting with counsel and obtaining their agreement, the Court instructed the jury: "You must find whatever is fair and reasonable in light of the evidence." *Id.* at 921:16-19. The jury's question does not indicate that the jury inextricably intertwined liability and damages in reaching its decision, and the instruction in response was neither coercive nor confusing in its response.

Plaintiff argues that another key indicium of jury compromise is that the issue of liability was hotly contested. Florida courts have treated that as evidence of jury compromise, *see, e.g.*, *Mekdeci*, 711 F.2d at 1515, but this trial was not in any way exceptional with respect to how vigorously the parties contested liability. In fact, most of the cases Plaintiff cites were comparative negligence actions in which the jury found an even or near-even split in fault. *E.g.*, *Newalk v. Fla. Supermarkets, Inc.*, 610 So. 2d 528, 529-30 (Fla. Dist. Ct. App. 1992) (plaintiff 50% at fault); *Een v. Rice*, 637 So. 2d 331, 333 (Fla. Dist. Ct. App. 1994) (plaintiff 60% at fault). Here the jury found Defendant only 1% liable – hardly indicative of a close contest on the issue of liability. In any event, almost any negligence action that proceeds to a jury trial would and

should involve contested issues of liability.  In sum, Plaintiff has not met his burden of marshaling the extraordinary evidence needed to demonstrate jury compromise.

### 2. "Erroneous" Admission of Toxicology Evidence

Plaintiff next argues that it is entitled to a new trial because of the "erroneous and prejudicial" admission of testimony of Dr. William Lee Hearn and related toxicology reports indicating a 0.22% urine-alcohol concentration post-mortem in the urine sample obtained from Knowlton's body.  Defendant presented this evidence to prove that Knowlton was negligent in venturing onto the Point while impaired.

At the outset, the Court notes that neither Plaintiff nor Defendant sought to exclude *in limine* the testimony of Dr. Hearn.  Plaintiff moved *in limine* to exclude the testimony of another defense expert toxicologist, Dr. Jesse Bidanset, and the Court granted that Motion. *See* D.E. 203, 375.  Plaintiff first objected to Dr. Hearn's testimony at the pretrial conference, held July 3, 2012, long after the deadline to file motions *in limine* had passed.  Plaintiff argued that, in light of the Court's ruling excluding Dr. Bidanset, the Court should also exclude Dr. Hearn's testimony because it was no longer probative due to the exclusion of Dr. Bidanset and would confuse the jury.  At trial, Plaintiff renewed its objections as to foundation and reliability. *See* D.E. 422, at 679:1-8.

In the instant Motion, Plaintiff argues that Dr. Hearn's testimony should have been excluded because (1) urine is not a reliable measure of blood alcohol content; (2) the evidence lacked proper foundation due to "significant problems" with the chain of custody for the urine sample;(3) the toxicology reports lacked trustworthiness, and were not admissible pursuant to the business records exception; and (4) the reports' probative value was outweighed by its unfair

22

prejudice to Plaintiff. For the reasons stated below, the Court disagrees.

Plaintiff's first argument, that "urine is not a reliable measure of blood alcohol content," misapprehends the testimony at trial. Dr. Hearn did not testify that urine is a reliable measure of blood alcohol content and did not testify that given the urine-alcohol concentration, Knowlton was intoxicated beyond a proscribed legal limit when he fell to his death. He testified only as to the results of the urine alcohol analysis he performed and did not opine as to the concentration of alcohol in Mr. Knowlton's blood. No other witness offered any evidence of a correlation between urine alcohol content and blood alcohol content. Presumably, Defendants had hoped to offer the testimony of Dr. Bidanset on this point, but the Court excluded his testimony, finding that Dr. Bidanset's conversion of urine alcohol content to blood alcohol content, as presented to the Court, was unreliable. *See* D.E. 375. While it may be true that "urine is not a reliable measure of blood alcohol content," as Plaintiff argues, Dr. Hearn did not contradict this point at trial and did not give any opinion as to Mr. Knowlton's blood alcohol content at the time of his death. Plaintiff is simply not entitled to a new trial based on allegedly prejudicial testimony that was never given.

Plaintiff's second argument is that, because there were gaps in the urine sample's chain of custody, the Court should not have allowed Dr. Hearn to present the results of his urinalysis to the jury. This argument is also unavailing. Gaps in the chain of custody affect only the weight of the evidence and not its admissibility. *United States v. Roberson*, 897 F.2d 1092 (11th Cir. 1990). Adequacy of proof relating to the chain of custody is not a proper ground for challenging the admissibility of the evidence. *United States v. Lopez*, 758 F.2d 1517 (11th Cir. 1985). Plaintiff did in fact attack the weight of the evidence by calling its own toxicology expert, Dr.

23

Robert Simon, as well as by cross-examining Dr. Hearn on the chain of custody issue.

Plaintiff next asserts that the Court erred in admitting the toxicology reports as business records under the business records exception to the hearsay rule. This argument is cumulative in that Plaintiff's incorporates his earlier arguments concerning reliability and chain of custody into a challenge under Federal Rule of Evidence 803(6) (stating that the hearsay exception does not apply if the "the source of information or the method or circumstances of preparation indicate lack of trustworthiness"). The Court has already rejected the grounds underlying this Rule 803(6) challenge, and perforce dismisses them as support for this argument.

Rule 803 does not require the court to graft chain-of-custody doctrine onto the business records exception, as Plaintiff maintains. Dr. Hearn's report met the requirements for admission under Rule 803(6) as a business document. For the purposes of this report, Rule 803(6) provides that a record of a condition or a diagnosis are not excluded by the rule against hearsay if (a) the record was made at or near the time of diagnosis by someone with knowledge; (b) the record was kept in the course of a regularly conducted activity of an organization or occupation; (c) making the record was a regular practice of that activity; (d) all these conditions are shown by the testimony of the custodian or qualified witness; and (e) there is no indication of a lack of trustworthiness. *See* Fed. R. Civ. P. 803(6). Here, Dr. Hearn's report clearly met the requirements for admission as a business document. Dr. Hearns is the recently retired director of the toxicology laboratory of the Miami-Dade County Medical Examiner's Office. At the time when he prepared the report he was acting pursuant to a legally authorized investigation undertaken by the government of the Commonwealth of the Bahamas. He further prepared the report while he had a legal duty to do so, as director of the laboratory, and used routine protocol

addressing such incidents.  The report sets forth Dr. Hearn's factual findings from the

Knowlton's urine analysis.  Lastly, other than challenging chain of custody, Plaintiff pointed to

nothing that would make the report untrustworthy.

   Plaintiff's final argument as to the toxicology report is that the possibility of it resulting in

unfair prejudice to Plaintiff significantly outweighed the report's probative value.  *See* Fed. R.

Evid. 403.  Under Rule 403, the balance is in favor of admissibility, with the Court judging

testimony in the light most favorable to its admission.  *See United States v. Elkins*, 885 F.2d 775,

784 (11th Cir. 1989).  The crux of Plaintiff's argument is that the jury was confused and misled

by testimony concerning the 0.22% urine-alcohol figure, without any sort of explanation of how

it might relate to Florida's legal intoxication limit of 0.08% blood-alcohol volume.  Plaintiff fails

to recognize that Defendants used the measurement only to corroborate their contention that

Knowlton's own negligence contributed to his death because he had been drinking before his fall

– not to prove any particular level of intoxication associated with a legal standard.  *See* 1

*McCormick on Evidence* § 205 (6th ed. 2006) (explaining that because direct measurement of

alcohol in the brain is not feasible, "samples of blood, urine, saliva, or breath can be taken, and

the alcohol level in these samples can be measured").  Moreover, neither Plaintiff's expert, Dr.

Simon, nor Dr. Hearn, testified that 0.22% urine alcohol concentration rendered Knowlton

intoxicated.  And both of these witnesses testified that urine alcohol content cannot be correlated

to blood alcohol concentrations.

   It was Plaintiff's prerogative to forcefully counter any suggestion that he felt would

damage his case.  Indeed, a party offers evidence precisely in order to make its own case at the

expense of its opponent's.  Rule 403 prohibits the admission of evidence that poses the threat of

*undue* prejudice – not the threat of *any* prejudice. This is especially true in comparative

negligence cases such as the one at hand, where each party endeavors to frame the others'

conduct as negligent. *See Loughan v. Firestone Tires & Rubber Co.*, 749 F.2d 1519, 1523 (11th

Cir. 1985) (allowing use of alcohol consumption in comparative negligence action and

characterizing argument in favor of exclusion as relevant to the weight of evidence, not general

admissibility); *see also Miles v. Gen. Motors Corp.*, 262 F.3d 720, 723 (8th Cir. 2001) (allowing

testimony regarding *odor* of alcohol on driver of vehicle involved in an accident, despite

subsequent blood testing indicating driver was not intoxicated). And Plaintiff did in fact present

evidence that Knowlton had not been drinking to the point of impairment before venturing to the

Point. This evidence included a photograph of Knowlton holding an open bottle of water Pl.'s

Ex. 43, and testimony that Knowlton and his friends "weren't there to drink," D.E. 358-15, at

7:21-25. Plaintiff also called witnesses who testified that Knowlton's friends continued to order

drinks at the bar after Knowlton left – suggesting that the hard-liquor cocktails evidenced by the

groups' bar tab receipts may not have been consumed by Knowlton at all. D.E. 358-23, at 7:12-

25, 8:1-16, 10:23-25, 11:1, 13:11-21. And, as discussed above, Plaintiff's expert witness

testified as to the lack of correlation between blood-alcohol concentration and urine-alcohol

concentration.


### 3. Plaintiff is Not Entitled to Judgment as a Matter of Law or to a New Trial based on Erroneous Jury Instruction

Plaintiff contends that he is entitled to judgment as a matter of law because Knowlton

was an invitee when entering upon the Point and that the jury should have been instructed

26

accordingly. D.E. 425, at 17. Plaintiff also sets forth two arguments in the alternative: (1) that

the instruction the Court gave defining an "invitee" was "inapplicable and confusing"; and (2)

that the Court should have included a special interrogatory on the verdict form as to whether

Knowlton was an invitee or a licensee. *Id.* Plaintiff makes these arguments in spite of the jury

having found that Knowlton was Defendant's invitee while on the Point.

      First, Plaintiff was not entitled to judgment as a matter of law that Knowlton was

Defendants' invitee on the Point. The classification of an individual on the premises of another

is generally a question of fact. *See Poe v. MC Phosphates MP, Inc.*, 885 So. 2d 397, 402 (Fla.

Dist. Ct. App. 2004); *Smith v. Reppond*, 555 So. 2d 431, 432 (Fla. Dist. Ct. App. 1990).

Accordingly, when the issue of whether Knowlton was an invitee or uninvited licensee on the

Point was raised pretrial, Judge Jordan ruled that the issue, and the subsequent issue of what duty

was owed to Knowlton as a result of his status, would have to be resolved at trial. D.E. 336, at 1.

At trial, while the evidence may have been uncontroverted that Knowlton was Defendants'

invitee while on Abaco Club premises, there was evidence to support a finding that the invitee

status did not extend to Knowlton once he entered onto the Point.

      Florida precedent has created a disjunctive test for determining when a landowner's

duties to protect its invitees may extend to property adjacent to its own. Such a duty will obtain

if at least one of the following is shown: (1) the landowner exercises some measure of control

over property it does not own, *Regency Lake Aparts. v. French*, 590 So. 2d 970, 974 (Fla. Dist.

Ct. App. 1991); *Galati v. Town of Longboat Key*, 562 So. 2d 780, 783-84 (Fla. Dist. Ct. App.

1990); (2) it is reasonable for invitees to believe that the invitor controls premises adjacent to his

own, or the invitor knows his invitees customarily use such adjacent premises in connection

with their invitation to invitor's premises, *see Borda v. E. Coast Entm't, Inc.*, 950 So. 2d 488, 491 (Fla. Dist. Ct. App. 2007); or (3) the landowner's forseeable zone of risk extends beyond the boundaries of its property, *Johnson v. Howard Mark Prods., Inc.*, 608 So. 2d 937, 937-38 (Fla. Dist. Ct. App. 1992); *Almarante v. Art Institute of Fort Lauderdale, Inc.*, 921 So. 2d 703, 705 (Fla. Dist. Ct. App. 2006).

At trial, there was conflicting evidence presented on whether Defendants extended an implied invitation to Abaco Club guests and residents to enter and use the Point, or whether the Point was within a "forseeaeble zone of risk." On the one hand, there was testimony that Defendants were well aware that owners and guests frequented the Point, and Plaintiff's witness testified that there were no measures whatsoever to prevent or deter that access. D.E. 420, at 271:18-25; 272:1. On the other hand, Defendants' Manager of Loss Prevention/Security testified that that Defendants' security personnel were instructed to warn people not to venture out on the Point because it was private property not belonging to Defendants. D.E. 422, at 635:12-16. Upon this record, there was a question of fact appropriate for the jury as to Knowlton's status on the Point.

The Court asked the jury to decide, as a preliminary question, "whether, when on the Point on the evening of August 19, 2007, David Knowlton was Defendant's 'invitee.'" D.E. 404, at 8. The Court gave Plaintiff's other proposed instructions, nearly verbatim. And, where the Court varied from Plaintiff's proposed language, it did so in favor of the language used in the Florida standard jury instructions, which have been approved by the Florida Supreme Court. *Compare* D.E. 404, at 9, *with* Fla. Standard Jury Instructions in Civil Cases § 401.20(a)). Plaintiff, however, insists that there was no question as to invitee status, but only as to "whether

28

Defendants breached a duty to Knowlton in light of the control or implied authority that they

exercised over *access* to the Point, or the foreseeable zone of risk that they created for their

invitees on the Point." D.E. 425, at 20. But those questions *were* put to the jury. After charging

the jury with the preliminary question of whether Knowlton was an invitee, the Court's

instructions continued:

> If you find that David Knowlton was an invitee, the next issue for you to
> determine is whether the Defendants were negligent in (a) failing to maintain the
> premises in a reasonably safe condition; (b) failing to correct a dangerous
> condition about which the Defendants either knew or should have known by the
> use of reasonable care, or (c) failing to warn David Knowlton of a dangerous
> condition about which the Defendants had or should have had, knowledge greater
> than that of David Knowlton.

D.E. 404, at 9. This instruction was meant to govern the jury's determination in the event that

they found Knowlton to be Defendant's invitee while on the Point. The jury did find that

Knowlton was Defendant's invitee, and in following the Court's instruction quoted above, did

consider whether Defendant breached that duty.

Plaintiff also argues that the Court erred in how its jury instructions defined "invitee."

D.E. 425, at 19. On this issue, the Court gave the jury the instruction set forth in the Florida

Standard Jury Instructions in Civil Cases § 401.16(a), explaining that an "invitee" is a "person

who is invited onto the land of another when he enters or remains there at the invitation of the

owner. An invitation may be either express or reasonably implied from the circumstances." *Id.*

This instruction has been approved by the Florida Supreme Court and reflects well settled Florida

law. *See In re Standard Jury Instructions*, 35 So. 3d 666, 695 (Fla. 2010) (approving standard

jury instruction 401.16(a) regarding "preliminary issue" of whether claimant was "invited on

premises owned by or in the possession of defendant"); *see also Wood v. Camp,* 284 So.2d 691, 695 (Fla. 1973); *Barrio v. City of Miami Beach,* 698 So. 2d 1241, 1243 (Fla. Dist. Ct. App. 1997); *Zipkin v. Rubin Const. Co.,* 418 So. 2d 1040, 1043 (Fla. Dist. Ct. App. 1982). And, given the jury's conclusion that Knowlton was Defendant's invitee on the Point, there is no basis for concluding that the jury was confused as to whether Defendants could be an "invitor" vis-a-vis Knowlton.

Finally, Plaintiff argues that the Court should have included a special interrogatory regarding Knowlton's status. First, Plaintiff's proposed verdict form did not include such an interrogatory D.E. 379, at 50-54. Furthermore, the instructions to the Jury were clear regarding the determination of Knowlton's status and the different elements of negligence to apply depending on whether the Jury found Knowlton to be an invitee or a licensee. *See* D.E. 404. A party may object to an instruction or the failure to provide an instruction, Fed. R. Civ. P. 51(c), (d), but it is within the Court's discretion whether or not to give the jury special interrogatories. *See Worsham v. A.H. Robins Co.,* 734 F.2d 676, 690 (11th Cir. 1981) ("Both the question of whether to employ special interrogatories and the question of how those interrogatories are to be framed are matters within the discretion of the trial judge.").

ORDERED AND ADJUDGED that Plaintiff's Motion for a New Trial and Motion for Judgment as a Matter of Law, D.E. 425, is DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Renewed Motion for Judgment as a Matter of Law, D.E. 428, is GRANTED.

DONE AND ORDERED  this _10th__ day of October, 2012 in chambers  at Miami,

Florida.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

cc:
counsel of record via cm/ecf

31